Nesta **OBERMER**, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

Civ. No. 1931.

United States District Court
D. Hawaii.
Nov. 24, 1964.

Dudley C. Lewis and Charles W. Key, Honolulu, Hawaii, Lewis, Buck & Saunders, Honolulu, Hawaii, of counsel, for plaintiff.

Herman T. F. Lum, U. S. Atty., District of Hawaii, by Yoshimi Hayashi, Asst. U. S. Atty., for defendant.

TAVARES, District Judge.

This is an action for the recovery of certain monies alleged to have been erroneously collected by defendant United States of America from Bishop Trust Company, Ltd., as Executor of the Estate of Seymour Oberner, Deceased, as federal estate taxes upon the estate owned by the deceased. Plaintiff Nesta Obermer, also known as Ernestine Elle Sawyer Obermer, is the widow of the deceased and sole residuary legatee of and under the will of said deceased. The following facts are found from the pleadings, pretrial order and other stipulations and from the testimony and evidence submitted to the Court.

Decedent, Seymour Obermer, died testate in Honolulu, Hawaii, on February 19, 1957. His will, which was probated in the State courts, provided for a few individual bequests but the bulk of his estate, which included 100 shares of stock of Austin Page, Inc., a New York investment corporation, was bequeathed to his wife, plaintiff in this case. Austin Page, Inc., hereinafter called "Austin," a New York investment corporation, issued a total of 200 shares of stock, of which decedent owned 100 shares at the time of his death and plaintiff his wife owned the other 100 shares. After decedent's death his executor, Bishop Trust Company, Ltd., filed a timely estate tax return on May 16, 1958, in which the executor reported estate taxes of $46,085.62, which amount was paid to the Internal Revenue Service at the time of filing.

On Schedule B of the Estate Tax Return filed by the Executor the deceased's 100 shares of stock of Austin were valued at $4,400.00 per share according to the Balance Sheet of February 19, 1958, the alternative valuation date used by the executor as permitted by Section 2032 of the Internal Revenue Code of 1954. Austin, after deduction of debentures payable and other liabilities, showed an earned surplus of $1,164,334.44 and Capital Stock of $20,000.00, or a total net asset value of $1,184,334.44. The adjusted book value per share of

Austin stock was determined at $5,921.67 per share and this amount was discounted 25 percent by the executor for the estate tax valuation purposes and the stock was returned at the value of $4,440.00 per share.

On February 19, 1959, the District Director sent a ten-day letter to Bishop Trust Company, Ltd., the executor, stating that he would increase the valuation of Austin shares to $5,921.67 per share for estate tax purposes.

Subsequently in March of 1959 a conference was held by the Estate Tax Examiner of the Internal Revenue Service with the executor, wherein it was agreed between the executor and the Government that a 12½ percent discount of the $5,921.67 per share of Austin stock should be allowed. On March 23, 1959, the executor executed Form 890, Waiver of Restriction on Assessment and Collection of Deficiencies in Estate Taxes, in the amount of $10,232.15. A deficiency in taxes of $10,232.15, with interest to April 3, 1959, in the amount of $536.84, was assessed on April 3, 1959, and these amounts plus further accrued interest of $117.46, or a total amount of $10,856.45 was paid by the executor on June 12, 1959. Plaintiff as sole legatee filed a timely claim for refund on September 16, 1960, claiming $17,024.78 plus interest thereon, alleging that the fair market value of the 100 shares of the Austin stock should be $3,350.00 per share, or in other words that the 33⅓ percent discount should have been given to the adjusted book value of $5,921.67 per share. The sum claimed by the plaintiff is a little confusing in that the original amount was stated in the pretrial order by way of amendment to the pleadings, that the claim of plaintiff was for the total sum of $17,679.08 plus interest and costs. After the evidence had been adduced the plaintiff was allowed to further amend so as to claim a 40 percent discount, amounting to $23,127.00 plus interest and costs. On the other hand the Government now claims that instead of allowing a 12½ percent discount the Government shouldn't have

allowed any discount at all. Section 2031 of Title 26 provides, in defining gross estate for purposes of valuation, as follows:

"(a) General.—The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States.

"(b) Valuation of unlisted stock and securities.—In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." [Before the 1962 amendment.]

■ In this connection the Court agrees with the following partial quotation from the brief of the Government, page 3:

"* * * because of the peculiar nature, makeup and the holdings of the Austin Page, Inc., * * * said corporation does not appear to be a corporation which can be valued on the basis of criteria set out in the general rule of measuring the fair market value of stock of a corporation where the stock is not listed on an exchange or sales made thereof."

■ How then shall we value these securities. It seems obvious that we must resort "to all other factors" which are mentioned in Section 2031(b). The

Government's position is apparently that, since Austin was a husband-and-wife fully-owned investment corporation which held readily marketable securities —namely so-called blue-chip stocks sold every day on the New York Stock Exchange, and held in blocks not so large as to call for any discount for shares sold in large blocks—and did not hold depreciable plants and buildings, nor was it engaged in trade, and because the corporation, even though a New York corporation, listed the home and furnishings[1] of the stockholders in Honolulu as assets thereof—the corporation was simply an alter-ego of the taxpayer and his spouse and no discount whatsoever should be allowed, but the stocks in question should be valued at their full market value on the stock exchange as of the date of valuation.

With this position this Court, however, disagrees, upon the basis of the evidence presented before this Court.

■ While the decisions cited by the Government hold essentially that, where the trier of facts has made a determination that no discount shall be allowed as to a particular personal holding company under the circumstances stated in those cases, the courts will not disturb this finding on appeal if under all the evidence such conclusion is not clearly unreasonable and wrong. This Court does not understand or interpret such decisions as laying down a hard and fast rule or formula that in general a discount should not be allowed in valuing the stock of such holding companies. In this connection, of course, the Court has adopted and taken into consideration all factual statements and legal conclusions *incorporated in the pretrial order* and agreed to by the parties as shown by the record. Among these facts and conclusions are the following:

(a) Plaintiff was 63 years of age and in good health on the day the deceased died. The Court infers that such good

---

1. The home and furnishings constitute such a minute portion of the assets of the corporation that the Court attaches little significance to them on the question of valuation.

health continued one year after the date of death.

(b) The company is classified as a personal holding company under the federal income tax laws. In consequence, practically all of its annual earnings, as determined under the federal tax statutes, must be distributed each year to avoid otherwise burdensome taxation.

(c) As of February 19, 1958, the company had debentures outstanding of $164,405.00 par value, with accrued interest thereon of $186,170.00, totaling in all $350,575.00.

By agreement of October 14, 1955, the company had concluded an arrangement with debenture holders whereby not less than $38,881.00 of par value, plus accrued interest thereon would be retired each year up to July 1, 1965, the particular debentures to be paid being in the sole discretion of the debtor. Securities owned by the company and having a market value equal to the debentures outstanding and all accrued interest thereon were to be held in an escrow account maintained by The First Boston Corporation in New York City.

Interest on the debentures accrued up to September 3, 1955, was at the annual rate of five percent. Since September 3, 1955, interest has been accrued at the rate of two percent per annum.

Of the total debenture interest shown on the balance sheet as accrued to February 19, 1958, $88,766.00 was on interest accrued prior to January 1, 1947, which amount had already been deducted from federal income tax returns. Thus only $97,404.21 of such accrued interest when paid would be a proper income tax deduction.

Of the debentures outstanding $86,000.00 par value were issued prior to January 1, 1934, thus making them available (upon retirement) as a credit, when computing the amount of dividends distributable for the year without accrual of prohibitive tax penalty on earnings withheld.

It is contended by the plaintiff and denied by the Government that to pro-vide for the liquidation of these debentures and accrued interest thereon, a buyer of Austin stock would have to face the following problems:

A. Current net income could only be used to the extent of the annual retirement of pre-1934 debentures and interest accrued on all debentures from January 1, 1947, to date of their retirement, otherwise burdensome federal taxation would take place in the amount of net earnings undistributed as dividends.

B. The company balance sheet as of February 19, 1958, showed the following assets immediately available to fund the balance of cash required for debenture retirement, plus the amount needed to fulfill the commitment for Austin stock purchase referred to hereinafter:

| | |
|---|---|
| Certificates of deposit | $35,000.00 |
| Bonds (Market Value) | 154,000.00 |
| Total | $189,000.00. |

C. The balance of cash required ($161,000.00) would have to come from the sale of common stock held in the company's portfolio or from current income, prior to July 1, 1965. The sale of common stock from the company's portfolio would result in substantial capital gains taxes.

Upon the request of the executor the directors of Austin on February 3, 1958, authorized the purchase of 15 shares from the estate. This was consummated on May 16, 1958, by payment of $67,500.00 amounting to $4,500.00 per share and representing an approximate 25 percent discount of the net value per share of February 19, 1957. This purchase being by the plaintiff herself, an interested party, and coming after the valuation date, cannot be considered typical and as a true indication of sale value of the stock.

A comparative 4-year income statement of the company, 1954 through 1957, is shown on Exhibit 3 attached to the pretrial order. The primary sales of securities in 1955 were $67,500.00 par value bonds for the sum of $70,067.00

and a block of common stocks for the sum of $36,162.00. The major sale of securities in 1956 was a large block of various common stocks for the sum of $409,904.00. These had a cost basis of $128,241.00.

A prospective buyer would consider, among other things, the earnings figure set forth in said exhibits as bearing upon the annual dividend income which could reasonably be expected after providing for debenture retirement and federal income taxes and that this would not present an attractive picture.

The market value of the company's investment in common stocks as of February 19, 1958 ($1,228,000.00) represented more than 100 percent of the Austin stockholders' equity and as such was conceivably subject to quick and wide fluctuation depending on possible future changes in the market.

New York law requires the affirmative vote of 66⅔ percent of the outstanding common stock for voluntary dissolution.

 The parties agree that the definition of "fair market value" is the price at which the 100 shares of Austin stock owned by the estate would have changed hands on February 19, 1958, between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. The Court finds that the value of the stock of this holding company was adversely affected by various factors including the following:

I. The fact that it is and was a personal holding company, besides being a New York corporation and as such required to pay New York State income tax, so that under Section 541 I.R.C. it was subject to onerous taxes if it did not distribute practically all of its earnings each year.

II. In this connection the Court feels that the contentions with respect to the effect of the debenture obligations upon fair market value, made in paragraph 2, on pages 4 to 7 of the plaintiff's trial memorandum filed June 12, 1964, are substantially well taken.

III. The so-called "built-in" capital gains tax of Austin is another factor which the Court finds would necessarily adversely affect the value of Austin stock to a mythical willing buyer. In this connection the Court agrees substantially with the reasoning in paragraph 3, on pages 7 to 8 of the plaintiff's trial memorandum.

IV. The so-called mythical buyer would also only obtain 50 percent control of the corporation, the other 50 percent being held by Mrs. Obermer. This divided control did not result in any difficulty so long as Mr. and Mrs. Obermer were living and not estranged. However, the injection of a new owner of Mr. Obermer's half of the stock would certainly complicate matters. Mrs. Obermer certainly could block liquidation of the corporation since the New York law required 66⅔ percent stock ownership to approve of any liquidation, and liquidation would seem highly improbable on her part because of the large capital gains tax which would have to be paid, amounting to some $145,000.00. Taking into consideration Mrs. Obermer's good health and life expectancy at age 63, according to the testimony, a mythical purchaser would certainly have to wait a long time for her death and possible liquidation of her stocks at that time. Thus he would be tied down to having to get along with the income producing ability of the corporation, at least until and unless some other arrangement could be reached with the other stockholder, or she died. The possible income return as analyzed by the witness Von Holt, would certainly not be attractive on a value per share of $5,921.67.

V. The Court also believes that the probable special selling expense of this unlisted stock would also have some effect on the valuation of this stock by a mythical buyer.

██ VI. The Court is convinced from the testimony of all of the witnesses that the Austin stock was unique and could not be compared with the stock of any closed-end investment company listed

on the exchanges. The evidence indicated that there was no listed stock with which Austin-Page shares could possibly be compared for valuation purposes. Even Mr. Peter Chang, although he testified that he used the stocks of a number of closed-end investment companies listed on the exchanges as the nearest thing to comparability he could find, admitted in effect that they were really not comparable, as this Court interprets his testimony. He also admitted lack of knowledge and consideration by him of several factors which he admitted would bear on determination of fair market value. The Court believes therefore, that Mr. Chang's valuation must be rejected under the facts and circumstances of this case. Among other factors which indicate the fallacy of Mr. Chang's valuation, the Court adopts those listed in paragraphs A. to E. on page 11 of plaintiff's trial memorandum.

The Court was favorably impressed with the testimony of plaintiff's witnesses, Atherton Richards, Richard C. Botts, and Herman Von Holt. Their testimony in general seems to make good sense to this Court and to be in line with economic reality.

On the other hand, for the defendant, Mr. K. L. Wong, Estate Tax Examiner for the Internal Revenue Service, did not claim to be an expert, and he frankly admitted practically relying entirely in the first instance on Mr. Peter Chang's appraisal for State inheritance tax purposes and Mr. Chang's re-evaluation as of one year after death, based entirely on comparison with stocks of closed-end funds, a method which this Court rejects as unsound under the facts of this case. While the Court has the highest regard for Mr. K. L. Wong as a sincere witness who spoke from his own honest convictions as a member of the Internal Revenue staff, he did not claim to be an expert and the Court cannot feel that his testimony offsets the testimony of the three expert witnesses called by the plaintiff who gave sound reasons based on their experience as experts in the field of investments and valuation of stocks. On the other hand, Mr. Peter Chang's testimony is rejected by the Court as based on insufficient consideration of relevant factors and entirely out of line with the actual facts. In this connection, Mr. Willard M. P. Wong, the only other expert witness called by the defendant, flatly contradicted Mr. Chang in testifying that the comparability claimed by Chang to closed-end fund stocks did not exist.

Finally as to Mr. Willard M. P. Wong, called as an expert witness by the Government, the Court found him mysterious, secretive, and evasive and his testimony entirely unconvincing. Among other things, although he seemed to recognize that a purchaser could not normally expect Mrs. Obermer to agree to an early liquidation, and that Mrs. Obermer's co-operation would be required to achieve a majority stock vote, not to speak of the 66⅔ percent stock vote required by New York law for liquidation, yet his total testimony led the Court to believe that the kind of buyer he had in mind could depend in some mysterious way upon harrassing Mrs. Obermer into cooperating in a manner so greatly to such buyer's advantage that such buyer could afford to, and would willingly pay the full adjusted value of the stocks held by Austin, without any discount whatsoever. The Court does not believe this is a sound basis for valuing stock. In short, the Court gives the testimony of this witness practically no weight at all.

In reaching the foregoing conclusions, the Court has read the authorities cited in the memoranda of both parties and in their oral arguments, and is convinced that the authorities so cited either support these conclusions or are distinguishable on their facts from the present case.

For example, in the Cruickshank case, 1947, 9 T.C. 162, strongly relied upon by the Government for the proposition that no discount should be allowed in a case such as this on account of possible capital gains taxes if the underlying stock assets should be sold—all values of the underlying assets held by the

holding corporation whose shares were to be valued were stipulated to, and *no expert testimony* was offered as to the adverse effect upon fair market value of the stock of such holding corporation of any of the following factors, among others: (a) a possible substantial capital gains tax if the holding company sold its stocks on the valuation date; (b) the necessity for a turn-over of stock from time to time in the interest of good management and to earn a reasonable dividend; (c) the fact that the number of shares of stock to be valued were less than a majority of the holding company's shares; and (d) the influence of special selling expenses on market value of these particular shares of stock. In the present case there was strong credible and convincing *expert testimony* as to the *adverse effect* of all of these factors upon the sale of stock.

As another example might be cited the so-called Barneson case, Bank of California, National Ass'n v. Com'r, 133 F.2d 428, 9th Cir. 1943. This case, together with the decision of the Board of Tax Appeals which was reversed in that case on other grounds, was cited by the Government in support of the proposition that lack of marketability of an unlisted stock where there are no actual sales or offerings for sale is a "mere assumption." A reading of the Board of Tax Appeals decision and the Court of Appeals decision discloses that the expert witness who testified for the taxpayer merely referred to an "assumed" lack of marketability of the stock and *did not testify directly* that the stock was in fact of less marketability, in his opinion. In the instant case we have emphatic testimony by three highly qualified experts who not only *testified* that the stock had a *lesser marketability because of various factors* testified to, but gave cogent and convincing *reasons* for their opinions.

■ The Court finds in favor of the plaintiff and against the defendant and finds that the fair market value of the Austin stock on the valuation date in question was a figure determined by deducting 33⅓ percent of the adjusted book value of $5,921.67 per share. The amount thus called for by way of judgment against the defendant will be computed by the plaintiff and if not agreed to by the defendant will be determined by the Court after hearing from the parties. Interest will be allowed as provided by law.

Meanwhile it is ordered that findings of fact and conclusions of law be prepared by the plaintiff in accordance with these general findings of the Court and submitted to the defendant counsel within fifteen days. Defense counsel will have fifteen days or such additional time thereafter as the Court may allow, taking into consideration the necessity for consulting with Washington, if deemed necessary, within which to file objections to the proposed findings and conclusions.